**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **RUBIN PFEFFER, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JON EDWARD ST. CLAIR, et al.,**<br><br>**Defendants.** | **Civil Action No.**<br>**23-11519-BEM** |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**MURPHY, J.**

This case arises out of a tragic vehicle collision between a coach bus and a 2022 Honda CR-V (the "CR-V"), in which one of the CR-V passengers sustained a severed spinal cord. Plaintiffs, passengers Rubin Pfeffer and Mara Pfeffer, and their son, Ian Pfeffer, brought an action against the following defendants: Grace St. Clair,[1] Fullington Auto Bus Company ("Fullington Auto Bus"), Fullington Trailways, LLC ("Fullington Trailways," together with Fullington Auto Bus, the "Fullington Companies," together with St. Clair, the "Fullington Defendants"), American Honda Motor Co., Inc. ("AHM" or "Honda"), Honda Motor Co., LTD., Honda R&D Co., LTD, Honda Development & Manufacturing of America, LLC, Honda of America Mfg., Inc., and Honda of Canada Manufacturing. The suit asserts claims for negligence against St. Clair (Count I), respondeat superior liability against Fullington Auto Bus (Count II), owner's responsibility for

[1] The Court notes that Defendant St. Clair legally changed her name to Grace St. Clair and uses female pronouns. *See* Dkt. 119 at 1 n.1; Dkt. 125 at 1 n.1. The Court will refer to her accordingly.

operation of motor vehicle under Mass. Gen. Laws ch. 231, § 85A against Fullington Trailways (Count III), loss of consortium by Mara against all Defendants (Count IV), loss of consortium by Ian against all Defendants (Count V), negligent hiring against Fullington Auto Bus (Count VI), negligent retention against Fullington Auto Bus (Count VII), negligent entrustment against the Fullington Companies (Count VIII), negligent design and/or manufacture and assembly against Honda (Count IX), and breach of the implied warrant of merchantability against Honda (Count X).[2]

Before the Court are two motions for summary judgment: Honda's motion for summary judgment as to Rubin's loss of parental consortium claim, and the Fullington Defendants' motion for summary judgment as to all claims against them. For the reasons set forth below, the Court will deny both motions.

## I. Background

### A. Factual Background

#### 1. The Collision

At approximately 5:00 p.m. on March 4, 2023, Rubin, who was driving, had stopped at a red light in the CR-V at the intersection of Beacon Street and Charles Street in Brookline, Massachusetts. Dkt. 126 ¶¶ 1–2, 4.[3] There were two cars stopped at the intersection in front of the CR-V—a Nissan Rogue and a Toyota Avalon. *Id.* ¶ 4. Mara, the only passenger, was seated in the front passenger seat of the CR-V. *Id.* ¶ 3. St. Clair, as an employee of Fullington Auto Bus,

[2] Though the amended complaint named a number of Honda entities, "the parties reached a streamlining agreement in which it was agreed that the case would proceed against AHM only" and "AHM would respond to discovery even if the requested material was in the possession of other Honda entities." Dkt. 67 at 4 n.1.

[3] Dkt. 126 is Plaintiffs' response to the Fullington Defendants' statement of material facts. Unless otherwise noted, citations to Dkt. 126 refer to facts that are undisputed or substantially agreed upon by the parties.

was operating a coach bus owned by Fullington Trailways to transport the St. Francis University track team from their hotel on Beacon Street to dinner. *Id.* ¶¶ 5, 8, 10.

As the bus approached the intersection of Beacon Street and Charles Street, the bus struck the rear of the CR-V at approximately 17 miles per hour. *Id.* ¶¶ 12–13. On impact, the CR-V was pushed into the Rogue, which was pushed into the Avalon, which was pushed off to the right side of the road. *Id.* ¶¶ 14–15. The bus pushed the CR-V and the Rogue approximately 100 yards. *Id.* ¶ 16. The CR-V was eventually pushed off to the left side of the street, where it turned 180 degrees before coming to a stop. *Id.* ¶ 17. As a result of the collision, Rubin sustained a severed spinal cord. *Id.* ¶ 1.

After the collision, the bus continued westbound, and the St. Francis University track coach asked St. Clair if she was going to circle around, to which she responded with confusion as to why they would need to turn around. *Id.* ¶¶ 20–21. When the coach informed St. Clair that the bus had hit several cars, she had no recollection of the collision and testified that she blacked out or lost awareness during the crash. *Id.* ¶¶ 22–23.

St. Clair then pulled the bus over upon noticing that the bus's cargo doors were open. *Id.* ¶ 25. The coach stated that St. Clair did not know why the doors were open and not closing properly. *Id.* ¶ 26. The Brookline police arrived shortly thereafter and asked St. Clair whether the bus was the same bus that had been involved in the accident. *Id.* ¶¶ 27–28. St. Clair stated: "Not to my knowledge," *id.* ¶ 29 (quoting Dkt. 121-5 at 32:18–22), and told the police that she could not remember anything that had happened, *id.* ¶ 30.

### 2. <u>St. Clair</u>

#### a. <u>Medical Treatment Post-Accident</u>

After the collision, St. Clair was transported to Beth Israel Deaconess Medical Center ("BIDMC") for evaluation and treatment. *Id.* ¶ 31. She remained at BIDMC from March 4, 2023,

to March 7, 2023. *Id.* ¶ 32. St. Clair's March 4, 2023 head scan showed "no acute intracranial abnormality," *id.* ¶ 33 (quoting Dkt. 121-7 at 2), and her March 5, 2023 brain MRI showed "no acute infarct, intracranial hemorrhage, mass lesion or abnormal enhancement," *id.* ¶ 34 (quoting Dkt. 121-8 at 2). On March 5, 2023, St. Clair told BIDMC neurologist Dr. Nadia McMillan that she did not recall what happened on the date of the collision after she started driving the bus and believed that she had blacked out for approximately seven minutes. *Id.* ¶¶ 35–37. St. Clair told Dr. McMillan that she had experienced a similar episode about ten years earlier in which she blacked out. *Id.* ¶ 39.

On March 6, 2023, BIDMC neurologists Dr. Neha Kumar and Dr. Clifford Saper wrote in a progress note that the most likely cause of St. Clair's episode was a partial complex seizure. *Id.* ¶ 40. An electroencephalogram ("EEG") performed on March 7, 2023, was the first EEG performed on St. Clair that showed epileptiform activity. *Id.* ¶ 43. On March 7, 2023, doctors started St. Clair on an antiseizure medication called Keppra, and discharged her from BIDMC. *Id.* ¶ 45.

**b. <u>Medical History</u>**

**i. <u>2014</u>**

On September 24, 2014, while working as a taxi driver, St. Clair was hospitalized at Mount Nittany Medical Center after an episode of "depersonalization-like activity" during an interaction with campus police when picking up a college student (the "2014 Incident"). *Id.* ¶¶ 46–50. Her September 24, 2014 EEG was normal, her September 24, 2014 head CT showed "no acute intracranial abnormality," and her September 25, 2014 brain MRI showed "abnormal thickening and signal within the cortex of the medial left temporal lobe, which appears to expand into the left subinsular cortex." *Id.* ¶¶ 51–53 (quoting Dkt. 121-11 at 3). Dr. John Mateer, St. Clair's treating physician, reported that he did not believe St. Clair's episode was due to encephalitis or seizures.

*Id.* ¶ 54. St. Clair underwent another brain MRI on September 26, 2014, which showed no significant change. *Id.* ¶ 55.

After seeing Dr. Mateer, St. Clair saw Dr. Kathleen Schaefer for a follow-up regarding suspected partial complex seizures and was started on Keppra. *Id.* ¶ 56. Dr. Schaefer restricted St. Clair from driving and recommended a repeat EEG and follow-up with Dr. Mateer. *Id.* ¶ 57. On October 1, 2014, St. Clair was seen at Mount Nittany Medical Center by Dr. Sharon O'Brien, who noted that St. Clair described the 2014 Incident as stopping in the middle of a sentence, staring off in the distance, not responding to any prompts from others, and then coming back into awareness after a few seconds. *Id.* ¶¶ 58–59. St. Clair had an EEG on October 13, 2014, which was "within normal limits." *Id.* ¶ 62 (quoting Dkt. 121-19 at 3). A letter by Dr. Mateer, dated October 24, 2014, stated the following:

> [Grace] St. Clair was hospitalized for what we thought were confusional migraines. [Sh]e had 2 of these events. To be certain that these were not seizures, we did appropriate imaging of the brain and electroencephalography on 2 occasions, and on neither study was there evidence for seizure activity noted. At the present time, we have no clinical evidence to suggest the events in question were seizures. I am, therefore, comfortable in stating that [s]he is safe to return to driving.

*Id.* ¶ 63 (quoting Dkt. 121-20 at 2). In November of 2014, Dr. Mateer noted that she had been hospitalized in September 2014 for a single episode of depersonalization-like activity, *id.* ¶ 66, and that she had had another episode of staring into space and had been started on Keppra, *id.* ¶ 67. Dr. Mateer also observed that the Keppra had helped St. Clair's longstanding migraine headaches. *Id.* ¶ 70. Dr. Mateer concluded: "[T]he eventual diagnosis was that of a possible confusional migraine/stress reaction, and [s]he has now been cleared to go back to driving and is doing so. [Sh]e has not [had] any further events." *Id.* ¶ 71 (alterations in original) (quoting Dkt. 121-13 at 3).

**ii. <u>2016–17</u>**

On July 26, 2016, a head CT scan showed "no acute intracranial findings," and a 48-hour ambulatory EEG on January 16, 2017, showed "no electrographic seizures or epileptiform discharges." *Id.* ¶¶ 72–73 (first quoting Dkt. 121-21 at 2, then quoting Dkt. 121-22 at 3). On January 19, 2017, Dr. Mateer noted that St. Clair's wife had reported that St. Clair would zone out and seemed to be staring off into space when the wife was talking to her. *Id.* ¶ 74. Before the January 19, 2017 appointment, St. Clair had contacted Dr. Mateer's office to report these episodes and ask to be seen and, in so doing, expressed concern that these episodes could be related to what had happened in the past. *Id.* ¶ 75. In his January 19, 2017 visit note, Dr. Mateer wrote:

> I first saw h[er] in 2014 when [s]he had an odd episode of depersonalization after altercation with local campus police. [Sh]e is a taxi driver and [s]he had some issues with how the students were being handled and became upset during a meeting. The end result was that the event sounded like a seizure. We placed h[er] on some Keppra. [Sh]e became [more] irritable on the drug. We finally stopped it, got a series of EEGs and then back peddled on our diagnosis and simply calling it a migraine at this point.

*Id.* ¶ 78 (quoting Dkt. 121-23 at 2).

On July 18, 2017, Dr. Mateer wrote that a seizure diagnosis had finally been eliminated. *Id.* ¶ 79. On April 25, 2018, Dr. Mateer wrote a letter stating that St. Clair was taking amitriptyline and that the medication should not affect her ability to drive. *Id.* ¶ 81.

### c. Hiring and Driving Record

St. Clair applied to Fullington Trailways on May 1, 2018. *Id.* ¶ 112. At the time of her hiring, St. Clair had no criminal record. *Id.* ¶ 114.[4] As of May 2, 2018, St. Clair's Pennsylvania Department of Transportation 10-Year Driver Record contained numerous incidents. *Id.* ¶ 115.[5]

When St. Clair was first hired by Fullington Trailways as a limousine driver, she had a valid Pennsylvania Class C license, and she received her commercial driver's license on January 23, 2019. *Id.* ¶¶ 116, 118. St. Clair was qualified as a Pennsylvania school bus driver on October 16, 2020, and again on October 2, 2021. *Id.* ¶¶ 119–20. On April 19, 2022, St. Clair updated her commercial driver's license. *Id.* ¶ 121. St. Clair received Department of Transportation Medical Examiner's Certificates pursuant to 42 C.F.R. § 391.41–49 for 2018–19, 2019–20, 2021–22, and 2022–23. *Id.* ¶ 122.

[4] On October 6, 2026, the Fullington Defendants notified the Court that on September 29, 2026, St. Clair had been found guilty of negligent operation of a motor vehicle and leaving the scene of an accident involving personal injury. Dkt. 134. Plaintiffs argue that the conviction precludes St. Clair from relitigating her negligence—or the Fullington Companies from relitigating their liability for her conduct—at trial. Dkt. 138 at 1–2. The Fullington Defendants counter that "Plaintiffs have not established a basis for binding [the Fullington Companies] to a criminal conviction entered in a prosecution to which they were not parties" and that "applying offensive issue preclusion against St. Clair would prejudice Fullington's independent defense while offering little judicial economy at trial." Dkt. 139 at 1. Though the Court need not, and does not, decide the issue at this stage, the Court anticipates that Plaintiffs' preclusion argument will prevail on both liability as to St. Clair (Count I) and respondeat superior liability and liability under Mass. Gen. Laws ch. 231, § 85A as to the Fullington Companies (Counts II and III).

[5] The Fullington Defendants only refer to three driving violations—speeding, too fast for conditions, and failure to obey—in their statement of material facts. Dkt. 126 ¶ 115. However, the very exhibit that the Fullington Defendants attach in support, the Pennsylvania Department of Transportation 10-Year Driver Record, includes six accidents two pages later, which Plaintiffs emphasize in their response to the Fullington Defendants' statement of facts. *Compare* Dkt. 121-32 at 4, *with id.* at 6; *see also* Dkt. 126 ¶ 115 (Plaintiffs state that "The same May 2, 2018 Pennsylvania Department of Transportation ten-year record disclosed, in addition to the three convictions for moving violations, that St. Clair had been involved in six accidents between September 2008 and November 2016, five of which — on April 18, 2009, November 14, 2009, March 20, 2010, January 29, 2012, and November 6, 2016 — involved injury to persons."). At the motion hearing, the Fullington Defendants did not appear to dispute that the additional incidents were included on the 10-Year Driver Record.

### 3. <u>Ian</u>

Ian is Rubin's son and Mara's stepson.[6] Dkt. 123 ¶¶ 5, 7.[7] Ian, who is in his forties, has been treated for autism, obsessive disorders, speech and communication disorders, and social anxiety. *Id.* ¶¶ 5–6. Ian "is described as low-functioning and nearly non-verbal." Dkt. 130 ¶ 3. Ian works part time as a mail clerk, Dkt. 123 ¶¶ 8–9, and resides in a group home with live-in staff, *id.* ¶¶ 11–12; Dkt. 130 ¶ 5. The group home was established in collaboration with nine other families with similarly situated adult children, and Rubin paid $350,000 for Ian's room in the home. Dkt. 130 ¶ 5. As of July 2025, the monthly fee to fund live-in assistance and board at the group home was $3,175. *Id.* ¶ 7. Occasional assessments ranging from $5,000 to $30,000 are necessary to provide for the upkeep of the group home and program. *Id.* ¶ 9. Rubin pays for the majority of the monthly fees and one-time assessments for Ian, except for a small fraction, which is covered by Ian's supplemental security income from the Social Security Administration. *Id.* ¶¶ 8, 10. In addition, Rubin created a special needs trust for Ian. Dkt. 123 ¶¶ 16–17. None of Ian's siblings financially supported Ian as of July 24, 2025. Dkt. 130 ¶ 18.

Rubin and Ian's siblings provide support and encourage Ian with respect to hygiene. Dkt. 123 ¶ 13. Prior to the collision, "Rubin provided close supervision and care, and thoroughly monitored Ian's well-being. Rubin was hands-on with all matters regarding Ian's socialization, friendship, shared activities, and transportation," and accompanied Ian to appointments and events. Dkt. 130 ¶ 19; *see also* Dkt. 123 ¶ 14. Specifically,

> Rubin handled all financial matters for Ian, including paying his bills for Specialized Housing services, room cleaning, serving as Payee for Ian's Social Security, advocating for Ian's rights to Social Security benefits, including procuring services of an attorney specializing in Social Security affairs, monitoring Ian's

[6] Ian's mother, Rubin's first wife, died in July 2024. Dkt. 130 ¶ 17.

[7] Dkt. 123 is Plaintiff's response to Honda's statement of material facts. Unless otherwise noted, citations to Dkt. 123 refer to facts that are undisputed or substantially agreed upon by the parties.

> banking and credit card transactions each month and addressing all disputes on credit cards such as scams and abuse by others on Ian's account, balancing his checkbook, and reporting and filing his annual income tax.

*Id.* ¶ 21. Rubin also "oversaw Ian's health and well-being including scheduling and accompanying Ian to medical, dental, and optometric appointments and necessary follow-ups," and served as "Ian's point person with the many institutions that provided financial, vocational and medical assistance for Ian, including Best Buddies employment services, the Massachusetts Department of Developmental Services, Ian's employers, Ian's speech pathologist, and Specialized Housing's clinical manager and house managers." *Id.* ¶¶ 22–23. Rubin spent approximately 25 hours per week with Ian—Rubin brought Ian with him on errands and took Ian shopping for clothes; Rubin brought Ian to visit relatives and attend family events; Rubin took Ian out to restaurants, movie theaters, and sporting events; and Rubin brought Ian to Rubin's home to help with limited chores to occupy Ian's time—and was in constant communication with Ian by text message when they were not together. *Id.* ¶¶ 27–35.

As a result of the collision, Rubin was paralyzed and is largely confined to his home. *Id.* ¶¶ 1–2. Rubin's ability to earn income has been seriously and adversely affected by his injuries.[8] *Id.* ¶ 11. Rubin does what he can for Ian by phone, but "[t]his is on a much restricted and reduced basis" as compared to before the collision. *Id.* ¶ 24. Ian relies on public transportation, but "[b]y his nature and behavior, Ian is vulnerable to strangers who may have ill-intent." *Id.* "The quality and frequency of the events for Ian, without his father, is less than satisfying to Ian as he depended on his father to help him navigate social interactions, uncomfortable situations, or overwhelming circumstances," and, "[a]s Ian is deficient in communication, he is easily and often

[8] As of June 2026, Ian's siblings had not discussed in detail how they would finance Ian's future needs. Dkt. 130 ¶ 26.

misunderstood." *Id.* Moreover, Rubin is unable to visit Ian at the group home because Ian's bedroom is on the third floor and not wheelchair accessible. *Id.* ¶ 6. Ian is hesitant to allow his siblings into his room, which is necessary for them to address his hygiene. *Id.* ¶ 25. In addition, Rubin can no longer play an active role as trustee of the group home. *Id.* ¶ 20.

### B. Procedural Background

On July 6, 2023, Plaintiffs filed suit against the Fullington Defendants. Dkt. 1. On July 8, 2024, Plaintiffs filed an amended complaint, adding the Honda entities as defendants.[9] Dkt. 33 (the "Complaint"). The Complaint includes claims for negligence against St. Clair (Count I), respondeat superior liability against Fullington Auto Bus (Count II), negligence under Mass. Gen. Laws ch. 231, § 85A against Fullington Trailways (Count III), loss of consortium by Mara against all Defendants (Count IV), loss of consortium by Ian against all Defendants (Count V), negligent hiring against Fullington Auto Bus (Count VI), negligent retention against Fullington Auto Bus (Count VII), negligent entrustment against the Fullington Companies (Count VIII), negligent design and/or manufacture and assembly against Honda (Count IX), and breach of the implied warrant of merchantability against Honda (Count X). *Id.* ¶¶ 36–72.

On September 4, 2026, Honda moved for partial summary judgment as to Count V, Dkts. 118, 118-2, and the Fullington Defendants moved for summary judgment as to all counts against them, Dkts. 119–20. The Court held a hearing on October 8, 2026, and took the motions under advisement.

## II. Legal Standard

Summary judgment will only be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no

---

[9] *See supra* note 2.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Grogan*, 552 F. Supp. 3d at 145 (quoting *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990)).

The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). However, "[t]he nonmoving party cannot fend off summary judgment unless it makes a competent demonstration that every essential element of its claim or defense is at least trialworthy." *Price v. Gen. Motors Corp.*, 931 F.2d 162, 164 (1st Cir. 1991) (emphasis omitted). "Where the non-moving party bears the ultimate burden of proof, the non-moving party 'must present definite, competent evidence to rebut the motion.'" *Satanic Temple, Inc. v. City of Bos.*, 684 F. Supp. 3d 21, 30 (D. Mass. 2023) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)), *aff'd*, 111 F.4th 156 (1st Cir. 2024).

## III. Discussion

### A. Honda's Motion for Partial Summary Judgment

Honda moves for summary judgment only as to Count V, Ian's loss of parental consortium claim, arguing that Plaintiffs have failed to demonstrate that Ian, an adult who lived independently from Rubin, was sufficiently dependent on Rubin to give rise to such a claim. Dkt. 118-2 at 1 (citing *Morgan v. Lalumiere*, 22 Mass. App. Ct. 262 (1986)).

In *Ferriter v. Daniel O'Connell's Sons, Inc.*, the Massachusetts Supreme Judicial Court first held that children could recover on a loss of parental society claim, "if they c[ould] show that they are minors dependent on the parent." 381 Mass. 507, 516 (1980), *superseded by statute on other grounds as stated in Sheehan v. Weaver*, 467 Mass. 734, 741 (2014). The court further explained:

> This dependence must be rooted not only in economic requirements, but also in filial needs for closeness, guidance, and nurture. In so holding, we do not abandon our determination to "proceed from case to case with discerning caution" in this field. As claims for injuries to other relationships come before us, we shall judge them according to their nature and their force.

*Id.* (quoting *Diaz v. Eli Lilly & Co.*, 364 Mass. 153, 165 (1973)).

Then in *Morgan*, the Massachusetts Appeals Court considered, for the first time, whether "to extend the category of dependent persons eligible to recover on loss of consortium claims to one who is not a minor but who is a handicapped person who resides in the household of his wrongfully injured mother and who is dependent upon her physically, emotionally, and financially." 22 Mass. App. Ct. at 270. The court concluded that "such a limited extension would be consistent with the humane policies underlying the *Ferriter* decision, and with related principles recognized in statutes and case law concerning the rights of adult handicapped children." *Id.*; *see also Norman v. Mass. Bay Transp. Auth.*, 403 Mass. 303, 306 (1988) ("The common thread in *Diaz*, *Ferriter*, and *Morgan* was the unique and intense dependency intrinsic to the relationship of

the parties."), *superseded by statute as stated in Monahan v. Town of Methuen*, 408 Mass. 381, 389–90 (1990).[10]

Certainly, courts have been careful not to unduly expand the extension first recognized in *Morgan*. *See, e.g.*, *Mendoza v. B.L.H. Elecs.*, 403 Mass. 437, 439 (1988) (holding that adult stepchild could not recover for loss of parental consortium because he lacked both a legal relationship to his stepfather "and the unique and intense dependency recognized in *Norman* as giving rise to the right of recovery by a mentally and physically disabled adult child"); *Rodriguez v. Cambridge Hous. Auth.*, 1998 WL 1184158, at *6 (Mass. Super. Apr. 17, 1998) ("The present case does not bear any resemblance to the unique facts of *Morgan*. Carlos was an adult at the time of these events, and he had not been living with the family for some time. He claims that his mother continued to provide him with 'social support' and financial assistance and that he has recently moved back in with his mother and Samuel. These facts do not make Carlos the equivalent of a severely handicapped adult child totally dependent on his parent. In a field where the appellate courts proceed 'with discerning caution,' it is not for this court to change the requirements set down by *Ferriter* and *Morgan*." (footnote omitted)). But courts have not categorically required that a child must live with the injured parent to be eligible. *See Barbosa v. Hopper Feeds, Inc.*, 404 Mass. 610, 618 (1989) ("We are unwilling to rule that, as a matter of law, Ann Margaret could suffer no loss of parental society because she was not living at home. Her severe physical and mental disabilities required that she live at a facility with full-time nursing capacity.").

---

[10] In *Norman*, the SJC had held that parents could not recover for loss of consortium of a child because, "[a]lthough parents customarily *enjoy* the consortium of their children, in the ordinary course of events a parent does not *depend* on a child's companionship, love, support, guidance, and nurture in the same way and to the same degree that a husband depends on his wife, a wife depends on her husband, or a minor or disabled adult child depends on his or her parent." 403 Mass. at 306 (emphasis in original). In 1989, in response to *Norman*, the state legislature created a statutory cause of action allowing a parent to claim loss of consortium of a seriously injured child. *See* Mass. Gen. Laws ch. 231, § 85X; *see also Monahan*, 408 Mass. at 389–90.

In sum, the adult child must depend on the injured parent "physically, emotionally, and financially," *Morgan*, 22 Mass. App. Ct. at 270, such that the child has a "unique and intense dependency" on the injured parent, *Norman*, 403 Mass. at 141; *see also Barbosa*, 404 Mass. at 618 (requiring evidence of "filial needs for closeness, guidance, or nu[r]ture, or any other dependence on [the child's] mother"); *Mendoza*, 403 Mass. at 439 (recognizing a "right of recovery by a mentally and physically disabled adult child"). Viewing the record before the Court "in the light most favorable to the nonmovant[s], drawing reasonable inferences in [their] favor," *Noonan*, 556 F.3d at 25, a trier of fact could find that Ian's reliance on Rubin constituted a "unique and intense dependency" that would allow Ian to seek loss of parental consortium, *Norman*, 403 Mass. at 141. Accordingly, Honda's motion for partial summary judgment is denied.

## B. Fullington Defendants' Motion for Summary Judgment

### 1. Count I: Negligence[11]

The Fullington Defendants argue that they are entitled to summary judgment on Plaintiffs' negligence claim against St. Clair because the collision resulted from a sudden and unforeseeable medical emergency. Dkt. 120 at 3. Under Massachusetts law, "a sudden and unforeseeable physical seizure rendering an operator unable to control his motor vehicle cannot be termed negligence." *Cottrell v. Laidley*, 103 Mass. App. Ct. 483, 489 (2023) (quoting *Ellingsgard v. Silver*, 352 Mass. 34, 36 (1967)). "A defendant who invokes the sudden medical emergency doctrine in moving for summary judgment must establish the existence of the claimed medical emergency and its unforeseeable nature with competent or expert medical evidence." *Id.* at 489–90 (internal quotation marks omitted).

[11] This issue is possibly resolved based on St. Claire's recent conviction, though the Court declines to make a ruling at this time. *See supra* note 4.

There is no dispute that St. Clair experienced a sudden medical emergency. Dkt. 120 at 4; Dkt. 125 at 9; Dkt. 126 ¶ 40. The only question, then, is whether St. Clair's March 4, 2023 seizure was foreseeable. Notwithstanding Dr. Mateer's July 2017 note stating that a seizure diagnosis had been eliminated, *see* Dkt. 126 ¶ 79, Plaintiffs have presented evidence that during transport to BIDMC after the March 4, 2023 collision, St. Clair told EMS personnel that she had experienced a seizure in the past, Dkt. 127 ¶ 6;[12] *see also* Dkt. 128-2 at 2 (Coastal Medical Transportation Services Patient Care Report), and that St. Clair had twice before lost awareness while driving; *see* Dkt. 127 ¶¶ 8–9; *see also* Dkt. 128-3 at 71:19–72:1 (deposition testimony from St. Clair describing driving the family car and "not remembering having gotten from point A to point B");[13] *id.* at 48:6–48:12 (deposition testimony from St. Clair describing the 2014 Incident, in which, while working as a taxi driver for her previous employer, she "lost awareness" and then had to work as a dispatcher until she was cleared to drive again).

Plaintiffs also presented evidence (1) that St. Clair's treating physicians were unsure of the frequency and severity of her symptoms, Dkt. 127 ¶¶ 31, 33, 46; *see also* Dkt. 128-15 at 3 (January 19, 2017 note from Dr. Mateer stating "it is very hard to get feel [sic] for the actual frequency of the headaches and these events"); Dkt. 128-16 at 2–3 (messages from St. Clair to Dr. Mateer in February of 2017, stating "I had stopped realizing when it happens, except for the worst, most intense migraines" and "there are a lot of times when I just don't realize it"), (2) that St. Clair minimized her symptoms to her treating physicians, *see* Dkt. 127 ¶ 31; *see also* Dkt. 128-15 at 3

---

[12] Dkt. 127 is Plaintiffs' supplemental statement of material facts.

[13] Plaintiffs acknowledge that "St. Clair later denied in her errata sheet that this episode occurred." Dkt. 127 at 3 n.2. "Under Fed. R. Civ. P. 30(e), [t]he deponent may make any corrections, substantive or procedural, but corrected deposition answers do not serve to wipe the slate clean with respect to the witness's earlier testimony which is available for use as impeachment evidence at trial." *Semmami v. UG2 LLC*, 2021 WL 1092546, at *4 (D. Mass. Mar. 22, 2021) (alteration in original) (internal quotation marks omitted).

(January 19, 2017 note from Dr. Mateer stating: "Recently h[er] wife has described periods of zoning out, where [s]he seems to be staring off into space while [her wife] is talking to h[er] and then [s]he has to have the room lights down and holds h[er] head. So, [her wife] is beginning to suspect [s]he is having more migraines then [s]he admits to. [Sh]e minimizes a number of them and [s]he claims [s]he remembers these events fairly well."), (3) that St. Clair failed to accurately disclose her conditions on the Department of Transportation medical examination forms, *see* Dkt. 127 ¶¶ 48–54; *see also* Dkt. 128-23 (May 4, 2018 Medical Examination Report Form); Dkt. 129-18 (April 29, 2019 Medical Examination Report Form); Dkt. 128-30 (October 31, 2019 Medical Examination Report Form); Dkt. 129-19 (October 16, 2020 Medical Examination Report Form); Dkt. 129-20 (October 8, 2021 Medical Examination Report Form), and (4) that St. Clair knowingly sought to get off of medications that would impede her ability to drive professionally, *see* Dkt. 127 ¶¶ 17–25, 42; *see also* Dkt. 128-6; Dkt. 128-7 at 2; Dkt. 128-8 at 2; Dkt. 128-9 at 2; Dkt. 128-10 at 2–3; Dkt. 128-11 at 2–3. Plaintiffs have raised genuine disputes of material fact as to St. Clair's perception of her own symptoms and whether she minimized her symptoms to be able to continue driving for work. *See* Dkt. 125 at 4–5, 11. Because a jury could find that St. Clair knew her symptoms were more serious than she disclosed, and that her medical emergency was foreseeable, summary judgment is unwarranted. Accordingly, the Fullington Defendants' motion for summary judgment is denied as to Count I.

**2. <u>Counts VI–VIII: Direct Negligence</u>**

The Fullington Defendants likewise argue that they are entitled to summary judgment on Plaintiffs' direct negligence claims against the Fullington Companies because the Fullington Companies did not know, and could not reasonably have known, that St. Clair was medically unfit to drive. Dkt. 120 at 13–19. Plaintiffs counter that "Fullington knew things Dr. Mateer never did — the six accidents on the driving record it pulled, the ten preventable accidents it adjudicated,

and its investigators' findings that St. Clair could not account for two of them." Dkt. 125 at 14. The Court agrees with Plaintiffs.

"[A]n employer whose employees are brought in contact with members of the public in the course of the employer's business has a duty to exercise reasonable care in the selection and retention of his employees." *Foster v. Loft, Inc.*, 26 Mass. App. Ct. 289, 290 (1988). Specifically,

> A claim for negligent hiring requires evidence that the employer failed to exercise due care in the selection of an employee, evidence that the employer knew or should have known that the employee who was hired was unfit and posed a danger to others who would come into contact with the employee during the employment, and evidence that the employer's failure proximately caused the injury of which the plaintiff complains.

*Armstrong v. Lamy*, 938 F. Supp. 1018, 1046 (D. Mass. 1996). And an employer can be liable for negligent retention when it "becomes aware or should have become aware of problems with an employee that indicated his unfitness" but fails to investigate, discharge, or reassign the employee. *Foster*, 26 Mass. App. Ct. at 291. However, a claim for negligent entrustment requires that the employer have "*actual knowledge* of the incompetence or unfitness of the operator to drive the vehicle." *Picard v. Thomas*, 60 Mass. App. Ct. 362, 369 (2004) (emphasis added).

The Fullington Defendants argue that because St. Clair *herself* could not have foreseen her medical emergency, the Fullington Companies were necessarily not on notice of her condition, Dkt. 120 at 14; that the Fullington Companies were entitled to rely on the judgment of St. Clair's treating professionals and the federal medical-qualification framework, *id.* at 14–17; and that a more thorough investigation by the Fullington Companies would not have revealed her undiagnosed condition, *id.* at 17–18 (citing *Cottrell*, 103 Mass. App. Ct. at 493–94).

Here, however, Plaintiffs have presented evidence that two incidents in which St. Clair struck pedestrians in crosswalks while driving for her previous employer were reported in the press. Dkt. 127 ¶ 78; *see also* Dkt. 129-2 at 2. In addition, Plaintiffs point to testimony by St.

Clair that during the 2014 Incident, she was "kind of staring off into space", and "not responding to stimuli" while driving, Dkt. 127 ¶ 9; *see also* Dkt. 128-3 at 48:13–16, and emphasize that when St. Clair was interviewed, the Fullington Auto Bus interviewer recommended St. Clair based primarily on "personality," "wasn't really digging into the previous employment, the technical requirements of the job," and did not contact St. Clair's previous employer. Dkt. 127 ¶¶ 69–71 (quoting Dkt. 128-34 at 37:24–38:5, 51:5–7). Plaintiffs' expert witness will testify that St. Clair's episode during her previous employment was "directly relevant to driver qualification and safety – particularly in light of the [Federal Motor Safety Carrier Administration] physical qualification standard . . . and should have been identified through proper prior-employer inquiry and follow-up questioning," and that the failure to do so indicates that the hiring process was superficial and inadequate. *Id.* ¶ 72 (alteration in original) (quoting Dkt. 128-35 at 21).

In addition, Plaintiffs presented evidence that St. Clair's 10-Year Driver Record revealed three violations and six accidents, five of which involved injury to persons, but that the Fullington Companies never requested police reports for any of the accidents or asked St. Clair about them. *Id.* ¶¶ 75–76; *see also* Dkt. 129-1 (10-Year Driver Record); Dkt. 128-33 at 120:16–21, 124:17–21 (deposition of Fullington Companies representative). Plaintiffs further asserted that, though St. Clair's full driver history—which included eight accidents, seven of which involved injury—was available for $9, the Fullington Companies did not request it until after the March 4, 2023 accident. Dkt. 127 ¶ 79; *see also* Dkt. 129-3 at 2, 4–6 (Full Driver's History dated March 13, 2023).

These facts distinguish the instant case from those upon which the Fullington Defendants rely. *See Cottrell*, 103 Mass. App. Ct. at 493–94 ("[A]lthough the plaintiff presented evidence that Colonial's hiring screening was minimal, there is no evidence to suggest that a more thorough screening process would have revealed that Laidley was unfit to drive. . . . Colonial required only

that each parts driver have 'a clean driving record.' There being no suggestion that an employer hiring a truck driver has a duty to subject applicants to a full physical . . . , given that Laidley's sleep apnea was undiagnosed at the time and there were no medical records stating that Laidley should not drive, the plaintiff has presented no evidence that Laidley's unfitness would have been discovered through more diligent screening."); *see also Coughlin v. Titus & Bean Graphics, Inc.*, 54 Mass. App. Ct. 633, 640–41 (2002) ("[A] background check would not have provided any additional information that would have enabled Titus & Bean to reasonably foresee that Kelley posed a threat to members of the public at or near 385R Court Street" and Kelly "was not expected to have regular contact with the public in the normal course of business," so "Titus & Bean could not have reasonably foreseen that Kelley posed a threat to members of the public."). Thus, Plaintiffs have raised genuine disputes of material fact as to whether Fullington Auto Bus knew or should have known that St. Clair was unfit for the purposes of Plaintiffs' negligent hiring claim. *See Armstrong*, 938 F. Supp. at 1046.

In addition, Plaintiffs have presented evidence of numerous accidents between 2021 and February 2023 involving St. Clair, all but two of which were deemed "preventable" and the fault of St. Clair. Dkt. 127 ¶¶ 86–93; *see also* Dkt. 129-9 at 2; Dkt. 129-10 at 3; Dkt. 129-11 at 5; Dkt. 129-12 at 2; Dkt. 129-13 at 2; Dkt. 129-14 at 3; Dkt. 129-15 at 2; Dkt. 129-16 at 2. In the February 17, 2022 incident, the Fullington investigator noted that St. Clair's explanation of the incident did not match the physical evidence on the vehicle and that it was "concerning that [St. Clair] doesn't know how this happened." Dkt. 129-10 at 3–4; *see also id.* at 2 ("Driver reported making contact with a dip in a black top road . . . . However pictures [s]he took suggest something completely else."); *id.* ("H[er] written and verbal statements don't match the photo evidence. [Sh]e felt my opinion of the 'object' struck was more pause-able [sic], but would not confirm or deny this."); *id.*

at 3 ("Driver should have definitely knew when [s]he backed up that damage was being done to the bumperette."). Similarly, after the March 14, 2022 incident, in which St. Clair struck another vehicle, the driver of the other vehicle reported to the Fullington Companies that after the collision St. Clair kept driving and did not look at him or acknowledge the collision. Dkt. 127 ¶ 91; *see also* Dkt. 129-11 at 2. Moreover, Plaintiffs have presented evidence the Fullington Companies erroneously deemed the February 17, 2022 incident to be St. Clair's first at-fault accident within the three-year window on which consequences for driving incidents are based, *see* Dkt. 129-10 at 4; Dkt. 127 ¶¶ 90, 96–99, and that the Fullington Companies had a policy of automatic termination after four at-fault accidents in a three-year period, Dkt. 127 ¶ 99; *see also* Dkt. 129-17 at 2, but failed to terminate St. Clair after more than four such accidents, *see* Dkt. 127 ¶¶ 86, 93; Dkt. 129-15 at 2 (listing St. Clair's current at-fault accident total as seven). Plaintiffs have thus likewise raised genuine disputes of material fact as to whether Fullington Auto Bus knew or should have known that St. Clair was unfit for the purposes of Plaintiffs' negligent retention claim. *See Foster*, 26 Mass. App. Ct. at 291. This same evidence also raises genuine disputes of material fact as to whether the Fullington Companies had actual knowledge that St. Clair was unfit to drive for the purposes of Plaintiffs' negligent entrustment claim. *See Picard*, 60 Mass. App. Ct. at 369.

The conclusion that Plaintiffs have raised triable questions of fact as to all three negligence claims is not disturbed by the fact that St. Clair had been certified by the Department of Transportation medical examiner. The Fullington Companies had in their possession a lengthy accident record on St. Clair before hiring her, and that record only grew after she was hired. In addition, Plaintiffs presented evidence that the Fullington Defendants were aware that St. Clair either failed to remember or accurately represent what had occurred in an accident in February 2022, and kept driving after a collision in March 2022, without acknowledging that she had hit

another vehicle. *See* Dkt. 129-10 at 2–4; Dkt. 129-11 at 2–4. Plaintiffs presented evidence that reasonable efforts by the Fullington Defendants could have uncovered prior health-related driving episodes. Therefore, notwithstanding her medical examiner certificates, a jury could find that the Fullington Defendants knew or should have known that she was unfit to drive.[14]

Finally, the Fullington Defendants argue that Plaintiffs cannot establish that the collision was a reasonably foreseeable consequence of the Fullington Companies' negligence because the collision did not result from driving skill deficiencies, but rather from a latent seizure disorder of which the Fullington Companies had no notice. Dkt. 120 at 18–19. However, to establish proximate cause, a plaintiff need only show "that a harm of the same general character was a foreseeable result of the defendant's conduct." *Jorgensen v. Mass. Port Auth.*, 905 F.2d 515, 523 (1st Cir. 1990). And, as discussed above, Plaintiffs have proffered extensive evidence as to the Fullington Defendants' notice of St. Clair's unfitness both before and after hiring her, from which an inference of medical unfitness could be drawn. *See supra* note 13. Ultimately, "[p]roximate cause is generally a question of fact for the jury." *Veilleux v. Nat'l Broad. Co.,* 206 F.3d 92, 124 (1st Cir. 2000). Simply put, the Fullington Defendants knew that St. Claire had a long history of driving accidents. A reasonable jury could infer that the Fullington Defendants were on notice that these accidents may have been caused by an underlying condition that rendered St. Claire an unsafe driver.

---

[14] Recognizing that the Fullington Defendants had information not available to the medical examiner such that they were on notice of St. Clair's unfitness, does not "make a motor carrier's lay personnel responsible for independently diagnosing neurological conditions or overriding an existing medical determination." Dkt. 120 at 16. Specifically, Plaintiffs presented evidence that the Fullington Defendants had actual knowledge that St. Clair appeared to either misrepresent or not know or remember what happened in a February 17, 2022 accident, which their own investigator found "concerning." Dkt. 129-10 at 3. And the Fullington Defendants had actual knowledge that she had continued to drive without stopping or acknowledging the driver of the vehicle she had hit. *See* Dkt. 129-11 at 2–4. A jury could therefore find that the Fullington Defendants were on notice that St. Clair had problems with either memory or candor and that her driving record both before and after her hiring indicated a medical issue impacting her ability to drive safely, notwithstanding the medical certifications (which rely in large part on self-reported conditions).

Accordingly, the Fullington Defendants' motion for summary judgment is denied as to Counts VI, VII, and VIII.

**3. Counts II & III: Vicarious Liability**

The Fullington Defendants move for summary judgment on Plaintiffs' respondeat superior claim against Fullington Auto Bus and negligence claim against Fullington Trailways as the owner of the bus under Mass. Gen. Laws ch. 231, § 85A. Dkt. 120 at 19–20. The Fullington Defendants argue that because St. Clair was not negligent by virtue of her sudden medical emergency, there is no tortious conduct to impute to either of the Fullington Companies. *Id.* Under Massachusetts law, both employer liability under respondeat superior and registered owner liability under Mass. Gen. Laws ch. 231, § 85A, are derivative of operator liability. *See Elias v. Unisys Corp.*, 410 Mass. 479, 481 (1991) ("The liability of the principal arises simply by the operation of law and is only derivative of the wrongful act of the agent."); *Gangl v. Ford Motor Credit Co.*, 37 Mass. App. Ct. 561, 563 (1994) ("Like the responsibility of a principal for the negligence of his agent, or a master for that of his servant, the liability of the registered owner is not joint and several, but derivative. A finding that the agent or servant is not negligent compels a similar finding, as matter of law, for the principal or master." (citing *Elias*, 410 Mass. at 481–82)). Accordingly, because the Court denied the Fullington Defendants' motion for summary judgment on Plaintiffs' negligence claim against St. Clair, the agent and vehicle operator, so too must the Court deny summary judgment on the derivative liability claims—Counts II and III.

**4. Counts IV & V: Loss of Consortium**

The Fullington Defendants likewise move for summary judgment on Plaintiffs' loss of consortium claims, arguing that because "Plaintiffs cannot establish any tortious conduct by St. Clair or [the Fullington Companies] that caused Rubin Pfeffer's injuries . . . Mara Pfeffer's spousal-consortium claim and Ian Pfeffer's parental-consortium claim also fail as a matter of law."

Dkt. 120 at 20; *see also Sena v. Commonwealth*, 417 Mass. 250, 264 (1994) ("As a general rule, a claim for loss of consortium requires proof of a tortious act that caused the claimant's spouse personal injury."). However, because the Court denied summary judgment on Plaintiffs' other claims against the Fullington Defendants, the Court must deny summary judgment on Counts IV and V.

## IV. Conclusion

For the foregoing reasons, Honda's motion for partial summary judgment is DENIED, and the Fullington Defendants' motion for summary judgment is DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: October 16, 2026